**Diane RAINS, Plaintiff,**

v.

**PPG INDUSTRIES, INC., Vulcan Materials Company, the Dow Chemical Company, Imperialchemicals Industries, PLC, Ashland, Inc., Ashland Distribution Co., Ashland Speciality Chemicalcompany, and Charles Levy, Defendants.**

No. 03–CV–0564–MJR.

United States District Court,
S.D. Illinois.

Dec. 23, 2004.

Del A. Goldenhersh, Goldenhersh & Goldenhersh, Belleville, IL, for Plaintiff.

Carol A. Rutter, Erik L. Hansell, Husch & Eppenberger, Dan H. Ball, Daniel J. Carpenter, Randy J. Soriano, Bryan Cave, Carol A. Rutter, Husch & Eppenberger, St. Louis, MO, Michael L. Zaleski, Quarles & Brady LLP, Madison, WI, Lise T. Spacapan, Heather L. Kramer, Fazal R. Khan, Jenner & Block, LLC, Daniel A. Popko, Joseph R. Vallort, Larry J. Chilton, Chilton, Yambert et al., Chicago, IL, Aimee B. Armsby, Filice, Brown et al., Oakland, CA, for Defendants.

## MEMORANDUM and ORDER

REAGAN, District Judge.

### I. *Introduction*

Removed from state court based upon diversity of citizenship, Plaintiff's case alleges Defendants are responsible in strict liability in tort for her multiple sclerosis resulting from her exposure to perchloroethylene between 1963 and 1979 while employed at her parents' Helpee Selfee Laudromat and Dry Cleaners (Helpee Selfee). Perchloroethylene is a commonly used chemical in the dry cleaning process. In support of her claim, Plaintiff relies upon the testimony of Dr. Charles N. Poser and Dr. Tipu Sultan who both opine, intra alia, that Plaintiff's exposure to perchloroethylene is causally related to her multiple sclerosis. Dr. Poser, a retained expert, is board certified in neurology and child neurology, while Dr. Sultan, a treating physician, is board certified in environmental medicine.

At Doc. 99, Defendants [1] filed "Defendants' Joint Daubert Motion to Exclude Causation Testimony of Charles M. Poser,

---

1. ICI PLC was dismissed on its motion alleging lack of personal jurisdiction by order at Doc. 144. The logic in this Memorandum and Order applies equally to it, had it remained a Defendant.

M.D." asking the Court for an Order barring the Plaintiff from:

1. Presenting any testimony of Dr. Charles M. Poser relating to his opinion that Plaintiff's multiple sclerosis was caused, exacerbated, or triggered by her alleged exposure to perchloroethylene, or

2. Making any reference to, or offering any evidence regarding Poser's causation opinions.

At Doc. 91, Defendants jointly filed "Defendants' Motion to Exclude Certain Testimony of Tipu Sultan, M.D." moving the Court to bar Dr. Sultan from testifying that Plaintiff's multiple sclerosis:

1. Was caused or contributed by her alleged exposure to perchloroethylene, or

2. From making any reference to, or offering any evidence regarding, Sultan's causation opinions.

On December 2, 2004, arguments were heard regarding the motions to exclude testimony and the Court took the matter under advisement indicating a written Order would follow. This is that Order.

Plaintiff's exposure to perchloroethylene, a chlorinated solvent that has been commercially produced since the early 1900s, occurred at her parents' dry cleaning facility, Helpee Selfee. The dry cleaning system at Helpee Selfee used perchloroethylene as a dry cleaning solvent and Plaintiff contends that from 1963 through 1979 she was exposed to the chemical and she contends direct contact exposures from 1966 through 1975 when she worked approximately 35 hours per week and transferred clothes from a wet stage to the dryer and was in direct contact with perchloroethylene. In 1979, her parents sold the Helpee Selfee laundromat and she never returned to it. She was not diagnosed with multiple sclerosis until 2001, some 22 years after her last exposure to perchloroethylene. In December of 1984,

however, she did experience neurological symptoms which she stated were due to "diabetic neuropathy," having been diagnosed with diabetes type 1 at the age of nine months and she is been insulin dependent since then. Type 1 diabetes is an autoimmune disease in which the body's immune system attacks insulin producing cells in the pancreas and Plaintiff was diagnosed with this condition well before any exposure to perchloroethylene. Multiple sclerosis is also an autoimmune disease in which the body's immune system attacks myelin, an insulating protein sheath that covers nerve fibers in the brain or nervous system. Multiple sclerosis occurs in women twice as frequently as men and often presents with remitting and relapsing episodes where a patient sporadically suffers from attacks and then will have long periods of dormancy during which they are symptom free.

## II. Standard of Admissibility of Evidence Under Rule 702

■ The admissibility of expert testimony in federal court proceedings is governed by FEDERAL RULE OF CIVIL PROCEDURE 702, as interpreted by the Supreme Court in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) which requires that the trial judge perform a gatekeeping function with respect to expert testimony. The trial judge is required to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.* at 589, 113 S.Ct. 2786. The Seventh Circuit, interpreting *Daubert,* has established that when evaluating the admissibility of proffered testimony, district courts are to undertake a two-step inquiry:

Daubert first "directs the district court to determine whether the expert's testimony pertains to scientific knowledge. This task requires that the district court consider whether the testimony has

been subjected to the scientific method: it must rule out 'subjective belief or unsupported speculation.' " Second, the district court must "determine whether the evidence or testimony assists the trier of fact in understanding the evidence or in determining a fact in issue. That is, the suggested scientific testimony must 'fit' the issue to which the expert is testifying."

*O'Conner v. Commonweath Edison Co.*, 13 F.3d 1090, 1106 (7th Cir.1994)(quoting *Porter v. Whitehall Labs., Inc.*, 9 F.3d 607, 613 (7th Cir.1993) (citations omitted)).

■ While the Supreme Court did "not presume to set out a definitive checklist or test," it did list several factors which should be considered including: whether a scientific theory or technique has been or can be tested; whether the scientific theory has been subjected to peer evaluation and publication; the actual or potential error rate and existence of any standards controlling the technique's operation; and whether the theory has been generally accepted in a particular field. *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786. This test of reliability, however, is flexible and there is no requirement that the district judge consider each one of the factors when making an admissibility ruling. *Id.; Bourelle v. Crown Equip. Corp.*, 220 F.3d 532, 535 (7th Cir.2000).

■ The purpose of the rule in *Daubert* "was to make sure that when scientists testify in court they adhere to the same standards of intellectual rigor that are demanded in their professional work." *Rosen v. Ciba–Geigy Corp.*, 78 F.3d 316, 318 (7th Cir.), *cert. denied*, 519 U.S. 819, 117 S.Ct. 73, 136 L.Ed.2d 33 (1996). FEDERAL RULE OF EVIDENCE 703 explicitly permits reliance on material "reasonably relied upon by experts in the particular field in forming opinions or inferences." FED. R. EVID. 703. "[Seventh Circuit] case law has recognized that experts in various fields

may rely properly on a wide variety of sources and may employ a similarly wide choice of methodologies in developing expert opinion." *Cooper v. Nelson*, 211 F.3d 1008, 1020 (7th Cir.2000).

### III. *Analysis*

■ Defendants contend Dr. Poser's causation opinions are inadmissible and should be excluded under FEDERAL RULE OF EVIDENCE 702 and 403 because the opinions are not grounded on any accepted scientific methodology, do not "fit" the facts of this case and their probative value is outweighed by the potential for confusion and unfair prejudice, *citing Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). As to Dr. Sultan's causation opinions, Defendants contend they should be excluded under FEDERAL RULE OF EVIDENCE 702 and *Daubert*, and its progeny. Defendants contend Sultan's opinions are utterly unreliable under *Daubert*, his opinions do not "fit" the facts of this case, and the probative value of his opinion is outweighed by its potential for confusion and unfair prejudice, *citing Daubert*, 509 U.S. at 589–90, 113 S.Ct. 2786 and FEDERAL RULE OF EVIDENCE 702.

**A. FOR SIMILAR REASONS, THE TESTIMONY OF BOTH DRS. POSER AND SULTAN DO NOT PASS MUSTER UNDER THE DAUBERT ANALYSIS.**

**1. *No Scientific Studies Connect Perchloroethylene to Multiple Sclerosis.***

Dr. Poser unacquviocably admits there is no study in the world literature that concludes or even suggests that perchloroethylene dry cleaning fluid causes or exacerbates multiple sclerosis (Poser transcript at 219). He further concedes that there are no case reports or anecdotes in any medical journal concluding that perchloroethylene causes multiple sclerosis

(Poser transcript at 355). Dr. Sultan admits that Plaintiff is the only patient he has ever seen where he has concluded the patient developed multiple sclerosis from occupational exposure to perchloroethylene (Sultan transcript at 330). Similarly, Dr. Poser testified that he has not seen more than one patient that was exposed to organic solvents [2] that he believed contracted multiple sclerosis as result thereof.

## 2. *The Ipse Dixit of Experts Does Not Provide a Sufficient Basis for Expert Testimony Under Daubert.*

■ The causation opinions of Drs. Poser and Sultan are not based upon epidemiology and both admit they are not toxicologists and have not done any controlled studies in that context, nor have they observed another patient like Ms. Rains in their practice. Instead, Dr. Poser bases his causation opinion upon 50 years of practicing medicine while Dr. Sultan did not know the meaning of "scientific method." *Daubert* makes it clear that in order to qualify as "scientific knowledge," "an inference or assertion" must be derived by the "scientific method," rather than by "subjective belief" or "unsupported speculation." *General Electric v. Joiner,* 522 U.S. 136 at 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) indicated "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert." [3] It is axiomatic that proper expert testimony must be derived by the scientific method. *Clark v. Takata Corporation,* 192 F.3d 750 (7th Cir.1999).

The following colloquy found at page 192 to 193 of the Poser transcript is illustrative of the fact that Dr. Poser relies upon his ipse dixit:

Q. So I am asking if you don't rely on epidemiology, you are not a toxicologist, you haven't done any controlled study in this context, and you have never observed another patient like Ms Rains, what science are you relying on for your opinion in this case?

A. Fifty years of practicing medicine.

Q. Anything else?

A. Isn't that enough?

Similarly, Dr. Sultan clearly did not rely upon the scientific method because he did not know what it meant and instead relied upon his ipse dixit as evidenced by the colloquy in the Sultan transcript at page 255:

Q. Can you describe for me the scientific method?

A. Okay. I do not know what the meaning of "scientific method" you are trying to ask me.

* * * * * *

Q. What is the scientific method?

A. Because I do not know the term what "scientific" is. If you define the word "scientific," then I can answer the question further.

* * * * * *

Q. So I take it the answer is no, they did not teach you the scientific method in medical school?

A. I do not know the word, what context you are referring to—what does that mean? Define—I am a kindergarten kid. I am a kindergarten kid. Explain to me what the

---

2. Perchloroethylene is one of many chemicals generically referred to as organic solvents. Others include Methanol (eq. antifreeze), Isopropyl alcohol (eq. rubbing alcohol), Butyl alcohol (eq. perfumes).

3. In translation from Latin: "It is because I say so."

word "scientific" means, so when I grow up, I will know what the work "scientific" . . . .

### 3. *Causation Opinions of Drs. Poser and Sultan are Not Based Upon Scientifically Valid Methodology and are Therefore Excluded as Unreliable Under Rule 702.*

 Neither Dr. Poser nor Dr. Sultan applied reliable scientific methodology to reach their opinions. Neither relied upon any evidence in the scientific literature or evidence from their own testing. Neither relied upon any valid scientific methodology in forming their opinions, particularly epidemiology or toxicology. Instead, Dr. Poser relies on his "50 years of experience" during which he has never saw another patient whom he believed developed multiple sclerosis from exposure to perchloroethylene. Dr. Sultan is not a neurologist, toxicologist, or epidemiologist and has no expertise in bio-statistics. Plaintiff is the only patient with multiple sclerosis Dr. Sultan was treating at the time of his deposition and has only seen a few MS patients in the past, unlike Dr. Poser who has seen thousands. Dr. Poser has never seen a similar patient to Plaintiff but he has described organic solvents (such as perchloroethylene) as a facilitator for multiple sclerosis.

Epidemiologic studies are the primary, generally accepted methodology for demonstrating a causal relation between a chemical and the set of symptoms or a disease. *Conde v. Velsicol Chemical Corp.*, 804 F.Supp. 972, 1025–26 (S.D.Ohio 1992), affirmed 24 F.3d 809 (6th Cir.1994). *See also Brock v. Merrell Dow Pharmaceuticals, Inc.*, 874 F.2d 307, 311, modified 884 F.2d 166 (5th Cir.1989)(**rejecting bendectin plaintiffs' reliance on non-epidemiological causation evidence, finding "the most useful and conclusive type of evidence in a case such as this is epidemiological studies."**)

Dr. Poser in "Multiple Sclerosis: Observations and Reflections—A Personal Memoir" published in the Journal of Neurological Science at 107 to 127 in 1992 stated "Over the past 15 years, more than 10,000 articles about multiple sclerosis (MS) have been published." There are few conditions about which so much has been written and yet about which so little is known, yet the exact ideology of MS is uncertain and it pathogenesis remains debatable.

He has also written that epidemiology in general supports the idea that multiple sclerosis is a result of genetics and an unidentified environmental factor, most likely a viral trigger (Poser transcript at 109, 203). Further, Dr. Poser discussed epidemiology in his deposition as follows:

In 2001, Dr. Poser wrote:

"Little is known about the possible relationship of organic solvent exposure and MS despite some epidemiologic studies from Italy and Sweden that have yielded controversial results." (Poser transcript, at 346).

Poser looks upon epidemiology with a jaundiced eye:

"I mean epidemiology has become such a fad. It is now considered, you know, as a science. It is not a science." (Poser transcript, at 112).

Q. Do you rely on any literature or studies other than what is in section C for your conclusion about MS and its association with organic solvents?

A. I don't depend on section C at all.

Q. You don't rely on [s]ection C?

A. No. (Poser transcript, See Also 174)

Q. I want to go back to whether or not you are relying on the studies in Exhibit C and exactly what you mean, because I have an awful lot of questions prepared to ask you about those and other studies of like kind.

A. I didn't rely on them. (Poser transcript, at 174).

The epidemiology study cited by Dr. Poser does not prove a generic association between organic solvents and multiple sclerosis. The following colloquy occurred in the Poser deposition at pages 353–54:

Q. Thank you. Dr. Poser, taking all the epidemiological studies together, would you agree with me that the studies that have considered whether organic solvents are associated with multiple sclerosis neither prove nor disprove an association?

A. Yes, I would agree with you. Many of them show an increased risk, but that is not sufficient to prove.

Q. And many of them do not show an increased risk? Correct?

A. Well, I think they do. And half and half.

Dr. Sultan does not have a background in epidemiology or biostatistics; and does not rely on it. (Sultan transcript, at 55–56). He admits to the lack of scientific data supporting a link between perchloroeythlene and multiple sclerosis.

Q. For all you know, there is not a single study anywhere in scientific literature that says that perchloroethylene causes multiple sclerosis.

A. I think there is—I do not know about the study, but I know that perchloroethylene does cause—see I am a treating physician. You are asking me questions which a treating physician does not deal as such. I mean, it is my knowledge, my information, what I have read over the years. That is all of the opinion.

Q. Do you have any knowledge of any study anywhere in the scientific literature in the entire world that concludes that perchloroethylene causes multiple sclerosis?

A. Not at this time. (Sultan transcript, at 267).

Dr. Poser admitted that in forming his opinion that perchloroethylene triggered Plaintiff's multiple sclerosis, he did not rely upon the epidemiology studies he chose to cite in Section C of his report. One of the reasons Dr. Poser does not rely upon the studies he cites in Section C of his report is because the Rains case is "absolutely unique" (Poser transcript, p. 170).

■ In order to determine whether a specific compound (like perchloroethylene) caused or contributed to cause a particular individual's malady (such as multiple sclerosis), an expert must use valid scientific methodology to reach a conclusion. Factors known as the Hill[4] criteria are helpful in determining whether a causal association from epidemiological evidence has occurred. Bradford Hill criteria provides a useful framework to analyze the reliability of a causal association. (*Hollander v. Sandoz Pharm. Corp.*, 289 F.3d 1193 (10th Cir.2002)); *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F.Supp.2d 584, 592–93; *Dunn v. Sandoz*, 275 F.Supp.2d 672 (M.D.N.C.2003); *In re Breast Implant Litigation*, 11 F.Supp.2d 1217, (D.Colo. 1998); *Blanchard v. Eli Lilly & Co.*, 207 F.Supp.2d 308 (D.Vt.2002); *Amorgianos v. AMTRAK*, 137 F.Supp.2d 147 (E.D.N.Y. 2001); *Glastetter v. Novartis Pharms. Corp.*, 107 F.Supp.2d 1015 (E.D.Mo.2000).

4. These factors, first set out by Sir Austin Bradford Hill (a professor of medical statistics), also have been referred to as "view points," emphasizing that one or more of the factors may be absent even though a causal relationship exists and no single factor is a sine qua non of causation.

In *Magistrini,* the court barred an expert from testifying that perchloroeythlene caused cancer because the expert had no scientific basis for extrapolating from other solvents to perchloroethylene. In doing so, the court highlighted the importance of the Hill criteria and laid them out as follows:

> In determining whether an observed association between a chemical and a disease is causal (*i.e.,* general causation), scientists are guided by various factors, which are often referred to as the Hill criteria. These factors include: (1) strength of association (*i.e.,* whether the association is strong and statistically significant); temporal relationship (*i.e.,* whether the timing of the exposure and the onset of the disease is consistent with the latency period of the disease); (3) consistency of the relationship (*i.e.,* whether the results of multiple scientific studies are consistent); (4) biological plausibility (*i.e.,* whether there exists a biologically plausible *mechanism* by which the agent *could* cause the disease); (5) consideration of alternative explanations (*i.e.,* whether the association could be account for by other factors); (6) specificity (*i.e.,* whether the *specific* chemical is associated with the *specific* disease at issue); (7) dose-response relationship (*i.e.,* whether an increase in exposure yields an increase in risk). *Magistrini* at 592–93.

The Court will address the Hill criteria in context of the instant case:

## 1. *Strength of association/consistency of relationship.*

Stated simply, neither Dr. Poser nor Dr. Sultan can point to a single study showing the association between perchloroethylene and multiple sclerosis. Dr. Poser cites to studies that do not involve perchloroethylene and admits they were poorly designed and that even he did not rely on them in the formation of his opinion. The Court believes that if there was a real world relationship between perchloroethylene and multiple sclerosis, surely there would be at least a handful of scientific studies addressing the issue. Instead, there are none. Perchloroethylene has been used since the early 1900s and has been used in the dry cleaning field for a long, long time. Logic dictates that a real world relationship between perchloroethylene and multiple sclerosis would have manifested itself in more than one individual (Ms. Rains) given the sheer numbers of laundry workers exposed over time. Instead, Dr. Poser admits the Plaintiff's case is unique and that he cannot think of another case in his own clinical experience or in the public's literature where perchloroethylene was associated with multiple sclerosis (Poser transcript, pp. 170, 357). Currently there is no association or consistency in the relationship between perchloroethylene and multiple sclerosis and the Plaintiff's case is the only one in existence.

## 2. *Temporal relationship.*

Dr. Poser opined that Plaintiff developed multiple sclerosis from her exposure to perchloroethylene around the time of puberty, specifically ages 12 to 16 which corresponds to the years 1963 to 1967 (Poser transcript, p. 172). However, she did not manifest any typical multiple sclerosis symptoms until almost 20 years (1984) or 35 years (2001) later (Poser transcript at pp. 394–95). This long time gap between cause and effect is unsupported by any multiple sclerosis related medical literature.

## 3. *Biological plausibility.*

After controlled studies indicate a consistent association between an agent and the disorder, scientists next consider whether there is a plausible biological mechanism at work before concluding a

causal relationship exists. Dr. Poser cannot articulate a biological mechanism by which perchloroethylene triggers multiple sclerosis. He suggests in his supplemental report that organic solvents may damage the brain-blood barrier (the barrier which separates blood vessels from the brain) but when asked by what mechanism he believes the organic solvents pass into the brain, he states "I have no idea." (Poser transcript at 305). He further testified that he can only "guess" how organic solvents might effect the brain-blood barrier (Poser transcript at p. 42).

#### 4. *Consideration of alternative explanations.*

The Hill analysis requires consideration of alternative explanations in considering causation. Dr. Poser's publications indicate he believes viruses are the most common trigger of multiple sclerosis and admits that most multiple sclerosis patients develop the disease without exposure to what he describes as facilitators (i.e. trauma, organic solvents, or vaccines) (Poser transcript at pp. 198–99). He admits the possibility that Plaintiff developed multiple sclerosis as a result of viral exposure (Poser transcript at p. 181) and admits that all organic solvents have the same effect on the brain-blood barrier (Poser transcript at p. 311) but he did not rule out whether the Plaintiff was exposed to other organic solvents besides perchloroethylene (Poser transcript at p. 316). Vaccines are a possible facilitator of multiple sclerosis but he did not look at the Plaintiff's vaccination records. Nor did he rule out the possibility that trauma facilitated the multiple sclerosis. It is clear Dr. Poser did not consider and rule out all alternative explanations for the Plaintiff's multiple sclerosis.

#### 5. *Specificity.*

Dr. Poser has no knowledge about the health effects of perchloroethylene or how it differs from other organic solvents (Po-

ser transcript at pp. 143–150). He admits that he cannot cite to any published study or test that specifically associates perchloroethylene with multiple sclerosis. The following colloquy occurred at page 29 of his deposition:

Q. Well, there certainly is no study in the world literature that concludes or even suggests that perchloroethylene dry cleaning fluid causes or exacerbates multiple sclerosis. Do you agree with that statement?

A. Absolutely.

Q. Ok. There is no such study?

A. Not that I know of.

#### 6. *Dose–Response relationship.*

Dr. Poser admits that he has no insight into what particular dose of perchloroethylene is required in order to ·cause harm (Poser transcript at p. 142). He has not attempted to calculate the dose of perchloroethylene that Ms. Rains was exposed to and is not qualified to do so (Poser transcript at p. 143).

He made no effort to calculate or determine whether or not she had exposure from inhalation, skin absorption, or oral ingestion. Further, he could not estimate how much perchloroethylene she was breathing in the air. (Poser transcript, pp. 164–165).

Likewise, Dr. Sultan did nothing to independently confirm what dose of perchloroethylene Ms. Rains was exposed to. He admitted that without knowledge of the chemical or the dose to which a person was exposed, one could not draw firm conclusions about causation and that calculations regarding exposure were not within his field of expertise. (Sultan transcript, pp. 286–287).

Applying the Hill criteria, and for the reasons above, the causation opinions of Drs. Poser and Sultan are based more on

subjective belief and unsupported speculation than relevant and reliable science and are therefore inadmissible under *Daubert.*

### IV. *Conclusions*

For the reasons stated above, Defendants' Joint Daubert Motion to Exclude Causation Testimony of Charles M. Poser, M.D. (Doc. 99) is **GRANTED**. Further, Defendants' Motion to Exclude Certain Testimony of Tipu Sultan, M.D. (Doc. 91) is **GRANTED**.

**IT IS SO ORDERED.**